319 Ga. 316
FINAL COPY

S22Z0180. INQUIRY CONCERNING JUDGE CHRISTINA
PETERSON.

PER CURIAM.

We have explained before that "[t]he judiciary's judgment will be obeyed only so long as the public respects it, and that respect will not long survive judges who act in a manner that undermines public confidence in their judgment and integrity." *Inquiry Concerning Coomer* ("*Coomer II*"), 316 Ga. 855, 855-856 (892 SE2d 3) (2023). In this case, Douglas County Probate Court Judge Christina Peterson has been charged with a number of violations of the Code of Judicial Conduct ("CJC"), including a number of violations that the Judicial Qualifications Commission ("JQC") says exhibited a pattern of judicial misconduct while in office. The JQC Hearing Panel found that Judge Peterson violated multiple rules in the CJC and that those violations warrant her removal from the bench.

We agree that removal is warranted here. As we explain more

below, the Hearing Panel found that the Director proved by clear and convincing evidence 28 of 30 counts alleging that Judge Peterson violated the CJC, and that discipline is authorized under the Georgia Constitution for 20 of those 28 counts. With respect to all 20 of those counts, we conclude that the Hearing Panel's findings are not clearly erroneous. And we agree with, and affirm, the Hearing Panel's conclusion that Judge Peterson's misconduct warrants discipline with respect to 12 of them, because the Director met her burden of showing that Judge Peterson's conduct constituted willful misconduct in office or conduct prejudicial to the administration of justice which brings the judicial office into disrepute. See Ga. Const., Art. VI, Sec. VII, Par. VII (a).[1] The seriousness of certain of those violations, the pattern of misconduct the Director proved by clear and convincing evidence, and the adverse demeanor and credibility determinations the Hearing Panel made after observing live testimony from Judge Peterson all

---

[1] As explained more in Division 2 (e) below, we pretermit whether other conduct by Judge Peterson, as set forth in eight other counts of the formal charges, constitutes violations of the CJC.

2

contribute to the conclusion we reach today.

1. *Background and Procedural History*

Judge Peterson was admitted to the State Bar of Georgia in 2013, and on March 5, 2020, she qualified to run for the office of judge of the Douglas County Probate Court and therefore became a judicial candidate for purposes of the CJC. See *Inquiry Concerning Coomer* ("*Coomer I*"), 315 Ga. 841, 851 (885 SE2d 738) (2023). In June 2020, she won a contested primary election. She then won the general election, in which she was unopposed, and she was sworn in for a four-year term as the Douglas County Probate Court judge on December 29, 2020.

In September 2021, the JQC filed formal charges against Judge Peterson alleging several violations of the CJC. The JQC amended its charges in February 2022 and again in July 2022, alleging 50 counts of misconduct.[2] The JQC Director dismissed 20 counts before

---

[2] In September 2021, the JQC Director filed a motion to suspend Judge Peterson pending the final outcome of its investigation. See JQC Rule 15 (C) (providing that this Court may suspend a judge with pay upon "receipt of sufficient evidence demonstrating that [the] judge poses a substantial threat

3

and during the final hearing, which was held over the course of seven days beginning in September 2023 and concluding in February 2024, leaving 30 counts remaining for the Hearing Panel's

---

of serious harm to the public or to the administration of justice"). We denied that motion in October 2021, concluding that although we were "concerned about the number and the escalation in seriousness of the allegations against Judge Peterson," there was not at that time "sufficient evidence to demonstrate that [she] pose[d] the 'substantial threat of serious harm to the public or to the administration of justice' necessary to support her interim suspension from office," in part given the passage of time since the alleged misconduct. The Director filed a second motion seeking interim suspension of Judge Peterson in July 2022. In August 2022, we denied the motion, noting that many of the charges against Judge Peterson were "quite significant" and "may well warrant severe discipline," but that she disputed the allegations; that it was "not at all clear that her alleged actions show[ed] that she 'pose[d] a substantial threat of serious harm to the public or to the administration of justice'"; and that although JQC Rule 15 (C) permitted suspension, it does not permit interim-suspension proceedings to be used as a substitute for a hearing on the charges. On June 21, 2024, the JQC Director filed a third motion for interim suspension of Judge Peterson based on alleged conduct that occurred on June 20, 2024. In it, the Director asked that this Court "immediately impose an interim suspension pending the Court's final determination in the above-styled matter; or in the alternative, direct the JQC's Hearing Panel to conduct a hearing on this Motion and file with this Court a record of the proceeding and a report setting forth findings of fact, conclusions of law, and a recommendation regarding interim suspension." The conduct alleged in that motion has not yet been the subject of any hearing, and in any event, we hereby dismiss that motion as moot because, as a result of this decision, Judge Peterson has now been removed from office. See Ga. Const., Art. VI, Sec. VII, Par. VIII ("Due process; review by Supreme Court. No action shall be taken against a judge except after hearing and in accordance with due process of law.").

4

resolution.[3]

The Hearing Panel issued a Report and Recommendation on March 31, 2024, finding that the Director had proven 28 of the 30 counts by clear and convincing evidence, but that discipline was authorized pursuant to the Georgia Constitution for only 20 of those counts.[4] In so doing, the Hearing Panel concluded that Judge

---

[3] Specifically, the Director dismissed Counts 5-12, 16-18, 20, 22-24, 27, 29, 36, 45, and 47. We note that the Director dismissed Counts 5-12 because they were premised on Judge Peterson's conduct before she became a judicial candidate, and as we concluded in *Coomer I*, the CJC "governs only those actions taken while a person is a judge or judicial candidate." 315 Ga. at 851 (emphasis omitted).

[4] The counts that the Hearing Panel found were not proven by clear and convincing evidence or for which discipline was not authorized under the Georgia Constitution included Counts 1-4 (related to social media posts Judge Peterson made; the Panel found that the Director proved by clear and convincing evidence violations of CJC Rules 1.2 (A), 1.2 (B), and 3.1 (A), but determined that no sanction was warranted because the Director failed to prove that Judge Peterson's actions, taken outside her judicial capacity, were done in bad faith such that discipline was authorized under the Georgia Constitution); Counts 25-26 (related to Judge Peterson's allegedly obstructing the JQC's access to public records; the Panel found that the Director failed to prove these counts by clear and convincing evidence); Counts 44, 46, and 48 (related to Judge Peterson's handling of a petition for letters of administration; the Panel found that the Director proved the counts by clear and convincing evidence but failed to prove that Judge Peterson acted in bad faith, such that discipline was authorized under the Georgia Constitution); and Count 49 (related to Judge Peterson's alleged practice of backdating judicial orders; the Panel found that the Director proved this count by clear and convincing evidence but failed to prove that Judge Peterson acted in bad faith, such that

Peterson had violated multiple rules in the CJC and recommended as a sanction that this Court remove her from office. Judge Peterson filed a Notice of Exceptions to the Report and Recommendation ("Exceptions"), see JQC Rule 24 (F), arguing that the Director had not sufficiently proven that she committed sanctionable conduct, and the Director filed a response to those Exceptions.

2. *Analysis*

As discussed more below, we agree with and affirm the Hearing Panel's conclusion that Judge Peterson's misconduct with respect to 12 of the 20 counts (Counts 13, 28, 30-35, 37, 39-40 and 42) at issue here was proven by clear and convincing evidence and warrants discipline.[5] Those counts relate to four separate matters, which

_____

discipline was authorized under the Georgia Constitution). The Director has not challenged the Hearing Panel's conclusions regarding these counts, so we do not address them. In addition, we note that Judge Peterson does not argue, and the record does not show, that any of the 20 remaining counts at issue here involved conduct that occurred before she became a judge or judicial candidate. See *Coomer I*, 315 Ga. at 851.

[5] As we also explain below, although the Hearing Panel's findings as to the eight remaining counts (Counts 14-15, 19, 21, 38, 41, 43, and 50) are not clearly erroneous, we need not decide whether the Hearing Panel correctly concluded that Judge Peterson's conduct as to those counts constituted

include Judge Peterson's handling of a criminal contempt matter (Counts 31 to 34), certain aspects of her conduct toward county personnel (Counts 28 and 30), her conduct during a meeting of her neighborhood homeowner's association ("HOA") (Count 13), and her handling of a petition for year's support (Counts 35, 37, 39-40, and 42). We discuss each of these four matters in turn below, applying the following analytical framework.

First, we review the Hearing Panel's findings as to Judge Peterson's conduct with respect to each matter. "We generally review factual findings by the JQC Hearing Panel for clear error and defer to the Hearing Panel's credibility determinations." *Coomer II*, 316 Ga. at 860. See also *Coomer I*, 315 Ga. at 847 (explaining that "'we give substantial consideration and due deference to the [Hearing Panel's] ability to evaluate the credibility of the witnesses who appear before it'") (citation omitted).[6] Judge Peterson's primary

---

violations of the CJC and warrants sanction, because affirmance of those counts is not necessary to reach our ultimate conclusion that Judge Peterson's removal from the bench is the proper sanction in this case.

[6] As we explained in *Coomer II*, although we generally defer to the

7

argument in her Exceptions to the Report and Recommendation is that the Hearing Panel's factual findings as to each of the matters at issue are clearly erroneous, because the Panel either failed to credit or to expressly mention in its Report and Recommendation evidence that Judge Peterson says supported different findings. In this respect, Judge Peterson devotes dozens of pages in her Exceptions to recounting this other evidence. But we need not and do not detail most of that evidence below; although Judge Peterson is correct that some of the evidence she notes (if credited by the Hearing Panel) could have supported different findings, the record in this case does not compel those different findings. To the extent the record contains evidence that could support findings in either direction, the Hearing Panel was authorized to make the findings that it did. See *Coomer II*, 316 Ga. at 860-861 (rejecting a judge's similar argument that evidence in the record could have supported

Hearing Panel's factual findings, "the broad and discretionary nature of our review in judicial discipline matters means that we need not always defer even in situations where we would defer to a factfinder in an ordinary appeal." 316 Ga. at 860 n.5. We reiterate that principle here, but also see no reason to depart from our general application of deference as articulated above.

8

different findings by the Hearing Panel, because the record did "not *compel* the different findings that he prefer[red]") (emphasis in original). After thoroughly reviewing the record and the parties' briefing, we conclude that the findings the Hearing Panel made that are material to our ultimate conclusion in this case are not clearly erroneous, and we defer to the findings that the Hearing Panel made, as outlined below.

Second, we consider whether these findings support the Hearing Panel's conclusions that Judge Peterson's actions, with respect to each matter, amounted to violations of the CJC rules the JQC charged. In considering whether the Director has proven violations of the CJC, "we employ a 'clear and convincing proof standard.'" *Coomer I*, 315 Ga. at 847 (citation omitted). And we review the Hearing's Panel's legal determinations de novo. See id. As explained below, we agree with the Hearing Panel's conclusions that Judge Peterson violated multiple rules in the CJC.

Third, our review of the Hearing Panel's findings and conclusions is necessarily conducted through the lens of the Georgia

9

Constitution, and specifically the grounds for discipline that the Georgia Constitution authorizes. Article VI, Section VII, Paragraph VII (a) of the Georgia Constitution ("Paragraph VII (a)") sets out five grounds for discipline: "for willful misconduct in office, or for willful and persistent failure to perform the duties of office, or for habitual intemperance, or for conviction of a crime involving moral turpitude, or for conduct prejudicial to the administration of justice which brings the judicial office into disrepute." Ga. Const., Art. VI, Sec. VII, Par. VII (a). See also *Coomer I*, 315 Ga. at 858. As detailed below, we agree with the Hearing Panel's conclusion that Paragraph VII (a) authorizes discipline against Judge Peterson for the counts discussed below because the Director has met her burden of proving that Judge Peterson's conduct with respect to each of the four matters at issue constitutes at least one constitutional basis that authorizes discipline: either willful misconduct in office or conduct prejudicial to the administration of justice which brings the judicial office into disrepute. See Ga. Const., Art. VI, Sec. VII, Par. VII (a).

We then briefly review the Hearing Panel's findings as to the

eight remaining counts (Counts 14-15, 19, 21, 38, 41, 43, and 50) that the Panel found were proven by clear and convincing evidence and warranted sanction. Although those findings are not clearly erroneous, we need not decide whether the Hearing Panel correctly concluded that Judge Peterson's conduct as to those counts constituted violations of the CJC and warrants discipline, because affirmance of those counts is not necessary to reach our ultimate conclusion that Judge Peterson's removal from the bench is the proper sanction in this case.

Finally, after reviewing all of the conduct underlying Judge Peterson's numerous violations of the CJC, we assess the proper sanction. On that point, we agree with the Hearing Panel that removal from office is the appropriate discipline here. See *Coomer I*, 315 Ga. at 847, 862 (explaining that "this Court is not well positioned to resolve the factual questions of intent that are crucial to determining whether discipline is constitutionally permitted," but that we review "legal determinations and the ultimate outcome de novo").

11

We now apply the analytical framework described above, beginning with an evaluation of the counts that the Hearing Panel found were proven by clear and convincing evidence and with which we agree warrant discipline. We address first the most troubling allegation: Judge Peterson's handling of a criminal contempt matter.

(a) *Handling of a Criminal Contempt Matter (Counts 31 to 34)*

(i) *The Hearing Panel's Findings Are Not Clearly Erroneous as to the Material Facts Pertaining to Counts 31 to 34*

With respect to Counts 31 to 34, the Hearing Panel found the following facts pertaining to Judge Peterson's handling of a criminal contempt matter. On August 2, 2021, a petitioner, who is a naturalized United States citizen but born in Thailand, filed in the Douglas County Probate Court a petition to amend her marriage-license application, which she had filed with the court in May 2016. The petitioner sought to correct the name she had listed as her father's name on the marriage-license application. In support of her petition, the petitioner attached a copy of her birth certificate, which

12

had been translated from Thai into English. The copy said that the document was "not recommended as a legal document." After reviewing the petition to amend, Judge Peterson issued on August 12, 2021, a "Notice of Trial or Hearing," which informed the petitioner that she was required to attend an in-person hearing on her petition on August 24 and that court-reporting services would be provided only if the petitioner arranged for them. The notice made no mention of any charges of contempt and did not advise the petitioner that she was entitled to have counsel present.

At the hearing on the petition to amend (which was not transcribed), the petitioner presented the copy of the translated birth certificate, and Judge Peterson concluded that it was "fictitious," "fraudulent," and "forged." The petitioner explained to Judge Peterson that she previously had listed her uncle's name, rather than her father's name, on her marriage-license application in 2016 because her father was not involved in her life and her uncle had raised her. Judge Peterson ultimately determined that the petitioner was trying to defraud the court and held her in contempt.

The contempt order stated that the petitioner "willfully provided false information on the marriage application"; the court had been "alerted to the fraudulent misrepresentations on August 2, 2021 when [the petitioner] filed a Petition to Amend Marriage Record"; and the petitioner was "in blatant disregard of the laws of the State of Georgia and of this [c]ourt evidenced by her fraudulent misrepresentations to the [c]ourt via her filings with the [c]ourt."[7]

---

[7] During her testimony before the Hearing Panel, Judge Peterson repeatedly referred to the allegedly fraudulent nature of the petitioner's translated birth certificate, a copy of which was admitted into evidence. When the Hearing Panel asked Judge Peterson what aspect of that document led her to conclude that the petitioner was defrauding the court, Judge Peterson said that at the hearing on the petition to amend, the petitioner "admitted under oath that this was not her birth certificate" and that she was trying to assist her mother in emigrating to the United States. The Hearing Panel then pointed out that Judge Peterson's contempt order appeared to refer only to the petitioner's marriage-license application as false (not the birth certificate), and Judge Peterson responded:

It was the documentation. But when you have somebody coming into court, swearing under oath that I knew I lied; I lied; and the only reason I am changing this and updating the court is because I am trying to get my mother in the country; here is [a] copy version of something, a nonlegal document; so I want you to take this as true on who my father is, even though I swore under oath that my father was over here; that was an issue to the court. That was a decision that was made on the time. It appeared like it was a fictitious document, or what I thought as a fraudulent document, as well as the representations and the lies under oath, so I did hold her in contempt.

14

Judge Peterson sentenced the petitioner to the maximum allowable term of incarceration for contempt—20 days in jail—but allowed her to "purge" herself of the contempt order after serving two days if she paid a $500 fine. After the petitioner served two days in the Douglas County Jail and paid the $500 fine, she was released from custody.

The Hearing Panel found that Judge Peterson "provided neither a firm nor a proper basis when she held [the petitioner] in contempt and, without explanation or justification, imposed the *maximum* term of incarceration plus a fine." (Emphasis in original.) It determined that the petitioner, who testified before the Panel, was "in good faith trying to correct" what appeared to be "an innocent mistake borne out of ignorance rather than ill-intent." The Hearing Panel noted that Judge Peterson testified that the petitioner sought to amend the marriage-license application so that her mother could emigrate from Thailand to the United States (although Judge Peterson could not explain how the amendment would assist the petitioner in obtaining emigration documents for her mother), whereas the petitioner testified that she became aware of the

15

mistake on her marriage-license application while she was completing emigration documents for her mother and believed she should correct the application so that it would not be inconsistent with her birth certificate. The Hearing Panel expressly credited the petitioner's testimony over Judge Peterson's.

In addition, the Hearing Panel expressly discredited Judge Peterson's testimony that she had not concluded that the petitioner made fraudulent representations before issuing the notice of the hearing on the petition. In this respect, the Hearing Panel found that Judge Peterson "predetermined that [the petitioner] had made a 'fraudulent misrepresentation . . . via her filings with the court on May 3rd of 2016' before ever conducting a hearing on the matter." The Hearing Panel noted that Judge Peterson denied making any such predetermination and testified before the Panel that she found the petitioner in contempt based on her submission of the supposedly fictitious birth certificate at the hearing on the petition, but the Panel found that testimony to be false, because it "contradict[ed] the plain language of the order," which referred only

16

to the alleged fraudulent misrepresentations in the marriage application.

Because evidence presented at the hearing supports the Hearing Panel's findings that are material to our ultimate conclusion, those findings, as recounted above, are not clearly erroneous. See *Coomer II*, 316 Ga. at 860-861.[8]

(ii) *Judge Peterson Violated CJC Rules 1.1, 1.2 (A), 1.2 (B), and 2.2*

The Hearing Panel concluded that the Director proved by clear and convincing evidence that Judge Peterson violated CJC Rules 1.1 (Count 31), 1.2 (A) (Count 32), 1.2 (B) (Count 33), and 2.2 (Count 34)

---

[8] Judge Peterson correctly points out in her Exceptions that the Hearing Panel noted, among other things, that the petitioner's "father was such a remote actor in her life that [the petitioner] did not even know his name in 2016 when she completed the license application," which contradicts undisputed evidence that the petitioner possessed the translated copy of her birth certificate, which correctly listed her father's name, for several years before she completed the marriage-license application. But that error does not affect our ultimate conclusion on Counts 31 to 34 because the Hearing Panel expressly noted other reasons for crediting the petitioner's testimony, including her demeanor and motive in testifying, and because the Hearing Panel's finding that the petitioner did not know her father's name when she completed the license application is not material to our ultimate conclusions related to this incident. See *Coomer II*, 316 Ga. at 860-861.

in connection with the contempt matter.[9] We agree.

To begin, the Hearing Panel credited the petitioner's testimony over Judge Peterson's account and found that, in attempting to amend her marriage-license application, the petitioner was "in good faith trying to correct" an "innocent mistake." After affording proper deference to that credibility determination, see *Coomer I*, 315 Ga. at 847, it is clear to this Court that Judge Peterson's contempt ruling was baseless. In response to the petitioner's good-faith effort to amend her marriage-license application so that it would not be inconsistent with her birth certificate, Judge Peterson made an unsubstantiated finding that the petitioner was somehow attempting to defraud the court, and then unjustifiably held her in contempt. Indeed, the Hearing Panel determined that Judge

---

[9] CJC Rule 1.1 says, "Judges shall respect and comply with the law." CJC Rule 1.2 (A) says, "Judges shall act at all times in a manner that promotes public confidence in the independence, integrity, and impartiality of the judiciary." Rule 1.2 (B) says, in pertinent part, "An independent and honorable judiciary is indispensable to justice in our society. Judges shall participate in establishing, maintaining, and enforcing high standards of conduct, and shall personally observe such standards of conduct so that the independence, integrity, and impartiality of the judiciary may be preserved." CJC Rule 2.2 says, "Judges shall dispose of all judicial matters fairly, promptly, and efficiently."

Peterson, in testifying before the Panel, lied about the basis for her contempt ruling when she repeatedly referenced her belief that the translated birth certificate was fraudulent, notwithstanding that her written contempt order focused only on the alleged fraudulent misrepresentations in the marriage-license application (not the birth certificate).

Judge Peterson's untruthful testimony in this respect underscores her conscious wrongdoing in determining that the petitioner had defrauded the court before issuing the notice of the hearing on the petition, because, as the Hearing Panel found, Judge Peterson purposely issued the notice without advising the petitioner that a criminal contempt charge on the allegation of fraud would be adjudicated at the hearing, so that the petitioner would be unprepared to defend herself when Judge Peterson summarily found her guilty of criminal contempt. As we explain below, these actions of misconduct evinced a willful disregard for the basic requirements of due process.

It is well established that "'[c]riminal contempt is a crime in

the ordinary sense,'" and "'criminal penalties may not be imposed on someone who has not been afforded the protections that the Constitution requires of such criminal proceedings.'" *Intl. Union, United Mine Workers of America v. Bagwell*, 512 U.S. 821, 826 (114 SCt 2552, 129 LE2d 642) (1994) (citations omitted).[10] In this respect, although a judge may announce punishment summarily and without further notice or hearing when "'contumacious conduct'" occurs in the judge's presence and "'threatens a court's immediate ability to conduct its proceedings, such as where a witness refuses to testify, or a party disrupts the court,'" when the "'alleged contumacious acts'" are committed outside the judge's presence, due process requires that the alleged offender is entitled to "'more normal adversary procedures.'" *Ramirez v. State*, 279 Ga. 13, 14-15 (608 SE2d 645) (2005) (citations omitted). See also OCGA §§ 15-9-34

---

[10] Criminal contempt differs from civil contempt, which "seeks only to 'coerc[e] the defendant to do' what a court had previously ordered him to do." *Turner v. Rogers*, 564 U.S. 431, 441 (131 SCt 2507, 180 LE2d 452) (2011) (citation omitted). Here, it is undisputed that the contempt was criminal (rather than civil), as Judge Peterson was not seeking to compel the petitioner to comply with a previous judicial order.

(a) ("The judge of the probate court shall have power to enforce obedience to all lawful orders of his or her court . . . by attachment for contempt under the same rules as are provided for other courts."); 15-1-4 (a) (1) (providing, as pertinent here, that "[t]he powers of the several courts to . . . inflict summary punishment for contempt of court shall extend only to cases of . . . [m]isbehavior of any person or persons in the presence of such courts or so near thereto as to obstruct the administration of justice").

Thus, a person being tried for contempt related to an act committed outside a judge's presence (also known as indirect contempt) "'must be advised of charges, have a reasonable opportunity to respond to them, and be permitted the assistance of counsel and the right to call witnesses,'" among other things. *Ramirez*, 279 Ga. at 15 (quoting *Young v. United States ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 798-799 (107 SCt 2124, 95 LE2d 740) (1987)). See also, e.g., *Taylor v. Hayes*, 418 U.S. 488, 497-498 (94 SCt 2697, 41 LE2d 897) (1974) (explaining that although a judge may, "for the purpose of maintaining order in the courtroom,"

21

"punish summarily and without notice or hearing contemptuous conduct committed in his presence and observed by him," "summary punishment always, and rightly, is regarded with disfavor" and "reasonable notice of a charge and an opportunity to be heard in defense before punishment is imposed are 'basic in our system of jurisprudence'") (cleaned up).

Here, Judge Peterson's contempt order shows that her ruling was based on the petitioner's allegedly providing fraudulent information on her marriage-license application—conduct that necessarily happened *outside* Judge Peterson's presence, since the petitioner filled out the application and submitted it to the court more than five years before being ordered to appear for a hearing— and as discussed above, the Hearing Panel discredited Judge Peterson's testimony to the contrary.[11] Even assuming for the sake of argument that the information the petitioner initially supplied

---

[11] Moreover, there is no allegation, let alone evidence, that the petitioner's conduct "'threaten[ed]'" or "'disrupt[ed]'" the "court's immediate ability to conduct its proceedings," see *Ramirez*, 279 Ga. at 14 (citation omitted), as would be required for summary punishment.

22

the court was fraudulent—and also assuming that filing such information could warrant a sanction of criminal contempt—the petitioner's alleged conduct constituted indirect contempt at most, such that the petitioner was entitled to the due-process protections generally afforded to other criminal defendants. Thus, before holding the petitioner in contempt, Judge Peterson was required to advise the petitioner of the contempt charges, provide her a reasonable opportunity to respond to them, and permit her the assistance of counsel and the right to call witnesses, among other processes and protections. See *Ramirez*, 279 Ga. at 15.

As the Hearing Panel determined, however, Judge Peterson provided the petitioner none of these foundational due-process protections before sentencing her to serve 20 days in jail. Even worse, the Panel concluded that Judge Peterson decided that the petitioner had committed fraud on the court before she issued the notice of the hearing on the petition and then purposely issued the notice in a way that failed to advise the petitioner that a criminal charge would be adjudicated at the hearing. As the Hearing Panel

23

pointed out, the contempt order stated that Judge Peterson "was alerted to the [petitioner's alleged] fraudulent misrepresentations on August 2, 2021[,] when [the petitioner] filed a Petition to Amend Marriage Record." Yet Judge Peterson's notice of the hearing on the petition, which was issued ten days after Judge Peterson "was alerted to" the alleged fraud, provided the petitioner no notice of the contempt charge, such that the petitioner could obtain counsel or meaningfully defend against the charge before she was summarily found guilty and sentenced. Noting that Judge Peterson testified that she knew the difference between direct and indirect contempt because she had previously "research[ed]" the issue, the Hearing Panel determined that Judge Peterson "knew the procedures she employed failed to meet . . . due process requirements" when she "predetermined" that the petitioner committed criminal contempt; issued the notice of the hearing without informing the petitioner that the criminal contempt matter would be adjudicated; ambushed the petitioner at the hearing by alleging that she had committed a crime; summarily found the petitioner guilty and sentenced her; and

24

then lied about her actions in her testimony before the Panel.[12]

Given these circumstances, we have no difficulty concluding, as the Hearing Panel did, that the Director proved by clear and convincing evidence that Judge Peterson failed to "comply with the law," in violation of CJC Rule 1.1, by failing to provide the petitioner basic due-process protections in a criminal proceeding; acted in such a manner as to severely diminish "public confidence" in the "integrity" and "impartiality of the judiciary," in violation of CJC Rules 1.2 (A) and (B); and failed to adjudicate the contempt matter fairly, in violation of CJC Rule 2.2. See *In re Judicial Qualifications Comm. Formal Advisory Opinion No. 239*, 300 Ga. 291, 297 (794

---

[12] In this regard, the Hearing Panel found that Judge Peterson "predetermined" "before ever conducting a hearing on the matter" that the petitioner had committed fraud when she filed her marriage-license application; Judge Peterson then issued the notice of the hearing on the petition to amend the marriage-license application, which made "no mention of contempt (or the risk of being fined or sent to jail)"; the petitioner's "hearing lacked any meaningful due process protections and essentially amounted to summary punishment—and incarceration—for conduct that occurred outside the presence of [Judge Peterson], which is prohibited"; and that to the extent Judge Peterson denied in her testimony before the Panel that she had predetermined the petitioner's guilt before she issued the notice of the hearing on the petition, the Panel "d[id] not credit such testimony because it contradicts the plain language of the [contempt] order which is a more reliable contemporaneous record of the events."

SE2d 631) (2016) (explaining that former Canon 2 (A) of the CJC, which said that "'[j]udges shall respect and comply with the law,'" "is not implicated by 'mere decisional or judgmental errors'" but is violated by "[a] knowing and willful misapplication of the law") (citation omitted); *Inquiry Concerning Fowler*, 287 Ga. 467, 468 & n.1 (696 SE2d 644) (2010) (concluding that a judge violated former Canon 2 (A) and former Canon 1, which said "'[j]udges shall uphold the integrity and independence of the judiciary,'" in the prior CJC, because he improperly stated on a routine basis to criminal defendants that they had the burden of proving their innocence); *In the Matter of: Inquiry Concerning a Judge*, 275 Ga. 404, 405-409 & n.4 (566 SE2d 310) (2002) (determining that a magistrate judge violated former Canon 2 and former Canon 3, which required judges to "'perform the duties of the judicial office impartially and diligently,'" of the prior CJC when he ordered a litigant to pay a fine without providing notice and a hearing, ordered another litigant to pay damages without notice and a hearing, and ordered a warrantless search without determining whether probable cause

26

existed); *In the Matter of: Inquiry Concerning a Judge*, 265 Ga. 843, 848-851 (462 SE2d 728) (1995) (concluding that a judge's conduct in refusing to set appeal bonds to which two criminal defendants were entitled by law, issuing two bench warrants without probable cause, and forcing a criminal defendant to plead guilty without counsel violated former Canons 1, 2, and 3 of the prior CJC, and noting that the judge's "cavalier disregard of these defendants' basic and fundamental constitutional rights exhibit[ed] an intolerable degree of judicial incompetence, and a failure to comprehend and safeguard the very basis of our constitutional structure"); *In the Matter of: Inquiry Concerning a Judge No. 94-70*, 265 Ga. 326, 329 (454 SE2d 780) (1995) (holding that a judge violated former Canon 2 (A) and other canons of the former CJC by "exercis[ing] [her] contempt power in order to intimidate and coerce other elected officials").

(iii) *Judge Peterson's Conduct Constitutes Willful Misconduct in Office, Such that Discipline is Authorized Under Paragraph VII (a) of the Georgia Constitution*

Having determined that Judge Peterson violated CJC Rules

27

1.1, 1.2 (A), 1.2 (B), and 2.2, we now turn to whether the Georgia Constitution authorizes discipline for these violations. In its Report and Recommendation, the Hearing Panel found that Judge Peterson's actions regarding this incident constituted willful misconduct in office because she acted in bad faith. See Ga. Const., Art. VI, Sec. VII, Par. VII (a). The Hearing Panel's factual findings that Judge Peterson's conduct involved bad faith are supported by the record and are therefore not clearly erroneous. See *Coomer II*, 316 Ga. at 866-873. Based on those findings, we agree that Judge Peterson's actions constituted "willful misconduct in office" and that discipline is authorized. Ga. Const., Art. VI, Sec. VII, Par. VII (a).[13]

"We interpret 'willful misconduct in office' to mean actions taken in bad faith by the judge acting in her judicial capacity." *Coomer I*, 315 Ga. at 859 (citation and punctuation omitted). And as

---

[13] The Hearing Panel alternatively concluded that additional constitutional bases existed that would warrant discipline: that Judge Peterson's conduct with respect to this matter constituted habitual intemperance and judicial conduct prejudicial to the administration of justice. See Ga. Const., Art. VI, Sec. VII, Par. VII (a). We need not decide whether those determinations were correct, because Paragraph VII (a) authorizes discipline on the ground that Judge Peterson committed willful misconduct in office.

we recently explained, bad faith generally encompasses at least two characteristics: "that the duty breached by the actor was known to that actor, and that the actor was acting with some self-interest or ill will. It certainly 'must involve something more than negligence.'" *Coomer II*, 316 Ga. at 866 (citation omitted). "'[B]ad faith is not simply bad judgment or negligence, but it imports a dishonest purpose or some moral obliquity, and implies conscious doing of wrong, and means breach of known duty through some motive of interest or ill will.'" Id. (citation omitted).[14]

Here, Judge Peterson was clearly acting in her judicial capacity when she found the petitioner guilty of criminal contempt and sentenced her. And the Hearing Panel's findings that she was acting

---

[14] We articulated these general characteristics in analyzing one of the other bases for judicial discipline under Paragraph VII (a) of the Georgia Constitution, "conduct prejudicial to the administration of justice which brings the judicial office into disrepute." As discussed more below, that disciplinary ground is implicated in two circumstances: when a judge's inappropriate actions outside her judicial capacity are taken in bad faith and when a judge's inappropriate actions in her judicial capacity are taken in good faith, but are "'unjudicial and harmful to the public's esteem of the judiciary.'" *Coomer I*, 315 Ga. at 859 (citation omitted). As we explained in *Coomer I*, both prejudicial conduct outside a judge's judicial capacity and willful misconduct in a judicial capacity require a showing of bad faith. See id. at 859-860. Thus, the general characteristics of bad faith that we set forth in *Coomer I* are applicable here.

in bad faith are supported by the evidence presented at the hearing. The Panel determined that Judge Peterson knew about the basic due-process requirements for indirect contempt proceedings, a finding that is supported by Judge Peterson's testimony on that point. The Hearing Panel also concluded that Judge Peterson "predetermined" that the petitioner had committed criminal contempt well before she issued the notice of the hearing on the petition to amend the marriage record, yet she purposely issued the notice without informing the petitioner of any such criminal charge and then summarily sentenced the petitioner without providing her any of the fundamental due-process protections to which she was entitled. As the Hearing Panel noted, the plain language in the notice of the hearing and in the contempt order contradicts Judge Peterson's testimony that she had not predetermined the petitioner's guilt before she issued the notice, such that the Panel was authorized to conclude that Judge Peterson's testimony in this respect was false and indicated that she was attempting to conceal her wrongdoing. This credibility determination by the Hearing

30

Panel was based in significant part on its observations of Judge Peterson's (and the petitioner's) testimony during the hearing, and it is "the kind of finding to which we offer considerable deference." *Coomer II*, 316 Ga. at 866.

In sum, the Hearing Panel's finding of bad faith with respect to Judge Peterson's wrongful summary adjudication of the criminal contempt matter is authorized by the evidence presented at the hearing, particularly her dishonest testimony about her wrongdoing. As we have explained, although we do not expect judges to be perfect, "we can and do expect them to be honest. The judiciary has no place for dishonest persons," as "'[t]he judiciary's authority . . . depends in large measure on the public's willingness to respect and follow its decisions.'" *Coomer II*, 316 Ga. at 866 (citation omitted). Because Judge Peterson's actions were not merely negligent, but painted a picture of conscious wrongdoing motivated by ill will, we agree that her actions were taken in bad faith. Thus, Judge Peterson's conduct constitutes willful misconduct in office, such that Paragraph VII (a) of the Georgia Constitution authorizes

31

discipline for her actions with regard to this matter. See Ga. Const., Art. VI, Sec. VII, Par. VII (a). See also *Coomer II*, 316 Ga. at 866-873 (holding that a judge's violations of CJC "Rule 1.1 and/or Rule 1.2 (A)," which were not done negligently but with self-interest and showed that he could not "be trusted to handle judicial matters before him with honesty and integrity," amounted to bad faith); *In re Judicial Qualifications Comm. Formal Advisory Opinion No. 239*, 300 Ga. at 297 (explaining that "[a] knowing and willful misapplication of the law, of course, would amount to bad faith and thereby implicate the Code of Judicial Conduct"); *Fowler*, 287 Ga. at 468-472 (noting that a judge's "ignorance of the law [wa]s inexcusable" where he "fail[ed] to grasp the basic tenets of criminal procedure to the extent that he d[id] not even understand the burden of proof in a criminal matter" and stemmed "not from unintentional mistakes or a lack of legal education, as [the judge] contend[ed], but from 'willful misconduct in office,'" among other things). Cf. *Bagwell*, 512 U.S. at 831 (explaining that the contempt power "uniquely is liable to abuse," and in the context of civil contempt noting that

"sanctioning the contumacious conduct . . . often strikes at the most vulnerable and human qualities of a judge's temperament, and its fusion of legislative, executive, and judicial powers summons forth . . . the prospect of the most tyrannical licentiousness") (citations and punctuation omitted).

(b) *Conduct Toward County Personnel (Counts 28 and 30)*

(i) *The Hearing Panel's Findings Are Not Clearly Erroneous as to Counts 28 and 30*[15]

With respect to Counts 28 and 30 (conduct toward county personnel), the Hearing Panel found as follows. By way of background, in April 2021, the Chief Judge of the Douglas County Superior Court limited Judge Peterson's after-hours access to the Douglas County courthouse following an incident in which she allegedly improperly admitted public citizens to the courthouse

---

[15] As explained more below in Division 2 (e), we review in this subsection only some of the conduct the Director charged with respect to Counts 28 and 30. And because we conclude that at least some of the charged conduct constitutes a violation of the CJC, we need not address the Hearing Panel's additional conclusions regarding other conduct the Director charged with respect to these counts.

without ensuring that they had undergone security screening by sheriff's deputies. During the days in which her after-hours access to the courthouse was limited, Judge Peterson submitted three "Event Worksheets," each of which requested three sheriff's deputies to be present at the courthouse after it was closed to the public so that she could have after-hours access. Specifically, she requested deputies to be present from 5:00 p.m. to 8:00 a.m. on April 22 to 23; 5:00 p.m. to 11:59 p.m. on April 23; and 12:00 a.m. to 8:00 a.m. on April 25 to 26. Although these requests would necessarily require taxpayer-funded deputies to work overtime, Judge Peterson was unable to provide a particular reason why she needed to be physically present in the courthouse at those times, most of which were overnight. Although Judge Peterson argues in her Exceptions that she often worked later than regular court hours and that her testimony on that point showed that her requests for after-hours access to the courthouse (and the presence of security) were legitimate, she also admits that the requests "might not have been the most appropriate response." The Hearing Panel expressly noted

Judge Peterson's testimony about these requests and found that Judge Peterson "never put forth a particular reason why she needed to be physically present inside the courthouse on the dates and times she requested."

In a separate event related to Judge Peterson's treatment of courthouse personnel, the sheriff's deputy who was scheduled to escort Judge Peterson from her chambers to her courtroom on May 11, 2021, did not arrive in Judge Peterson's chambers on time. Believing that she would be late for court, she pushed the panic button under her desk to summon the deputy. Thinking there was an emergency in Judge Peterson's chambers, sheriff's deputies hurried to her chambers. When they arrived, they realized that there was no emergency. At her hearing before the Hearing Panel, Judge Peterson testified that she did not know the button was a "panic button" that was to be used only in emergencies. The Hearing Panel expressly discredited Judge Peterson's testimony on that point.

After reviewing the record and considering Judge Peterson's

35

Exceptions, we cannot say that the Hearing Panel's findings as to these incidents—which are supported by record evidence—are clearly erroneous. See *Coomer II*, 316 Ga. at 860-861.

(ii) *Judge Peterson Violated CJC Rules 1.2 (B) and 2.8 (B)*

With respect to Count 28, the JQC charged Judge Peterson with violating CJC Rule 1.2 (B), alleging that her requests for after-hours court access and her activation of the panic button when there was no emergency were not in accordance with the "high standards of conduct" necessary to preserve the "independence, integrity, and impartiality of the judiciary." And with respect to Count 30, the JQC charged Judge Peterson with violating CJC Rule 2.8 (B) by failing to demonstrate "patient, dignified, and courteous" conduct to the county personnel involved in the matters discussed above.[16] Based on the findings detailed above, the Hearing Panel determined that the Director proved by clear and convincing evidence that Judge

---

[16] CJC Rule 2.8 (B) says, "Judges shall be patient, dignified, and courteous to litigants, jurors, witnesses, lawyers, and others with whom they deal in their official capacity, and shall require similar conduct of all persons subject to their direction and control."

Peterson violated Rules 1.2 (B) and 2.8 (B), because her actions were not consistent with the "high standards that Rules 1.2 (B) and 2.8 (B) require of members of the judiciary." The Hearing Panel determined that Judge Peterson "made multiple frivolous requests for middle-of-the-night courthouse access without any showing that she in fact intended to be in the building during these times—and plainly without consideration of the taxpayer expense that comes with paying multiple deputies overtime for each such demand," and that she "abused the courthouse panic button system when, losing patience after waiting only several minutes, she accelerated her deputy escort's arrival via that button rather than by phone or e-mail." The Panel found that Judge Peterson's actions "raise grave concerns about [her] general judicial demeanor and the manner in which she treats others."

We agree with the Hearing Panel that Judge Peterson violated CJC Rules 1.2 (B) and 2.8 (B).[17] By requesting sheriff's deputies to

---

[17] Judge Peterson does not argue in her Exceptions that the Hearing Panel's findings of misconduct do not constitute violations of CJC Rules 1.2 (B) and 2.8 (B).

work throughout the night so that she could have after-hours access to the courthouse (without any showing that she actually planned to be in the building, let alone work, during those wide-ranging timeframes) and using the panic button to summon a deputy to escort her to court, Judge Peterson did not demonstrate the decorum and temperament required of a judge. As discussed above, the Hearing Panel expressly found that Judge Peterson's testimony that she did not know the button was a "panic button" that was to be used only in emergencies was "unconvincing[ ]." We defer to that credibility finding. See *Coomer I*, 315 Ga. at 847. We therefore agree with the Hearing Panel's conclusions that Judge Peterson failed to maintain the "high standards" required to preserve the "integrity" of the judiciary and failed to demonstrate a "patient, dignified, and courteous" demeanor to county personnel.

(iii) *Judge Peterson's Conduct Constitutes Willful Misconduct in Office, Such that Discipline is Authorized Under Paragraph VII (a) of the Georgia Constitution*

With respect to Counts 28 and 30, the Hearing Panel concluded

38

that Judge Peterson's conduct was in her judicial capacity and in bad faith, such that it constitutes willful misconduct in office. See Ga. Const., Art. VI, Sec. VII, Par. VII (a).[18] We agree. The Hearing Panel found that, with respect to Judge Peterson's requests for after-hours deputy coverage and her activating the panic button, she "knowingly acted discourteously and impatiently in order to advance her self-interest." This finding is supported by the evidence presented at the hearing, including Judge Peterson's inability to explain during her testimony why she needed to be present at the courthouse for extended periods of time in the middle of the night and her false testimony that she was unaware of the proper use of the panic button. The Hearing Panel also found that Judge Peterson "summoned the deputy in bad faith" when she pressed the panic button because she "likely was motivated by ill will toward the

---

[18] The Hearing Panel alternatively concluded that two other constitutional bases existed that would warrant discipline: that Judge Peterson's misconduct constituted habitual intemperance and was prejudicial to the administration of justice which brings the judicial office into disrepute. See Ga. Const., Art. VI, Sec. VII, Par. VII (a). But because we conclude that Judge Peterson's actions stemmed from willful misconduct in office, we need not decide whether these alternate bases for discipline apply.

Sheriff's Office" after the incident that led to her restricted after-hours access to the courthouse. Because the Hearing Panel found that Judge Peterson's actions were not merely negligent but were motivated by self-interest, and that finding is not clearly erroneous, we conclude that Judge Peterson's actions were taken in bad faith while she was acting in her judicial capacity, such that she committed willful misconduct in office. Thus, discipline is authorized for this conduct. See Ga. Const., Art. VI, Sec. VII, Par. VII (a); *Coomer I*, 315 Ga. at 859-860.

(c) *HOA Meeting (Counts 13 to 15)*

(i) *The Hearing Panel's Findings Are Not Clearly Erroneous as to Counts 13 to 15*

With respect to Counts 13 to 15, the Hearing Panel found the following pertaining to Judge Peterson's conduct during a meeting of her neighborhood HOA in March 2022. Judge Peterson, representing herself, filed a lawsuit against the HOA and members of the HOA Board of Directors in July 2021. The lawsuit alleged, among other things, that the defendants had breached the HOA

40

bylaws by holding an improper election to select the Board of Directors and sought an injunction to compel a special election in accordance with the bylaws. Judge Peterson knew that the defendants were represented by counsel.

On March 31, 2022, while her lawsuit was still pending, Judge Peterson attended an HOA meeting, over which two members of the Board of Directors presided. The meeting was video-recorded, and the recording showed that during the meeting, Judge Peterson asked the two members of the Board of Directors questions about her "lawsuit," urged them to "call a special election," and offered to "dismiss the lawsuit" if they did so. When other meeting attendees spoke out against Judge Peterson, she engaged in hostile exchanges and made sarcastic remarks toward them, such as, "You are in a low place." After the meeting, Judge Peterson told the members of the Board of Directors that their counsel was giving them bad legal advice.

The Hearing Panel's findings, as summarized above, are not clearly erroneous, because there was evidence presented at the

hearing to support them. See *Coomer II*, 316 Ga. at 860-861.

(ii) *Judge Peterson Violated CJC Rule 1.1*

We agree with the Hearing Panel's conclusion that Judge

Peterson's conduct in connection with this incident violated CJC

Rule 1.1 (Count 13).[19] The Hearing Panel determined that Judge

---

[19] As discussed more below in Division 2 (e), we do not address whether the Hearing Panel correctly concluded that Judge Peterson violated CJC Rules 1.2 (A) and (B), as alleged in Counts 14 and 15. In addition, we note that Judge Peterson briefly argues in her Exceptions that the Hearing Panel failed to address her contention, advanced in a motion for a directed verdict filed during her hearing, that certain CJC rules violated her right to free speech under the First Amendment to the United States Constitution and Article I, Section I, Paragraph V of the Georgia Constitution of 1983. Specifically, in her motion for a directed verdict, Judge Peterson claimed that Counts 1 to 4 (which charged violations of CJC Rules 1.2 (A), 1.2 (B), 3.1 (A), and 1.3, respectively, based on social media posts that Judge Peterson made) and 13 to 15 (which charged violations of CJC Rules 1.1 (premised on a violation of GRPC 4.2 (a)), 1.2 (A), and 1.2 (B), respectively, based on Judge Peterson's conduct at the HOA meeting) violated her right to free speech. The Hearing Panel rejected Judge Peterson's free-speech-violation claims in a section of its Report and Recommendation addressing its conclusion that the Director had not proven Counts 1 to 4 by clear and convincing evidence. It is not clear whether the Hearing Panel also rejected Judge Peterson's free-speech claims as to Counts 13 to 15 in its Report and Recommendation. But in any event, we note with respect to those counts that Judge Peterson's motion for a directed verdict focused on her contention that CJC Rules 1.2 (A) and 1.2 (B) (which require judges to preserve the "independence, integrity, and impartiality of the judiciary"), as alleged in Counts 14 and 15, violated her right to free speech. She made no specific argument, however, about CJC Rule 1.1 (which requires judges to "respect and comply with the law" and which violation was premised on her failure to comply with GRPC 4.2 (a)), as alleged in Count 13. Instead, Judge Peterson implied in a single sentence in a footnote in her motion that

Peterson failed to "respect and comply with the law," in violation of CJC Rule 1.1, when she violated Rule 4.2 (a) of the Georgia Rules of Professional Conduct ("GRPC") for lawyers, which says: "A lawyer who is representing a client in a matter shall not communicate about the subject of the representation with a person the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized to do so by law

the free-speech arguments related to alleged violations of CJC Rules 1.2 (A) and 1.2 (B) in Counts 14 and 15 were "applicable" to the Rule 1.1 violation alleged in Count 13. And in her Exceptions, Judge Peterson makes only the cursory assertion that "[a]s an individual, [she] has the right to associate with and debate with her chosen association that is constitutionally protected by the First Amendment."

Even to the extent Judge Peterson has preserved her free-speech claims as to Counts 13 to 15, we need not address her arguments that the alleged violations of CJC Rules 1.2 (A) and 1.2 (B) in Counts 14 and 15, violated her right to free speech because, as discussed more below, we do not address whether she violated those rules. And as to her free-speech argument about CJC Rule 1.1, as alleged in Count 13, we note that—contrary to the implication in her motion for a directed verdict—the legal analysis that applies to that claim is not the same analysis that applies to her free-speech claims regarding alleged violations of CJC Rules 1.2 (A) and 1.2 (B) in Counts 14 and 15. Compare *Gentile v. State Bar of Nevada*, 501 U.S. 1030, 1071-1074 (111 SCt 2720, 115 LE2d 888) (1991) (explaining that "lawyers in pending cases [are] subject to ethical restrictions on speech to which an ordinary citizen would not be" and "the speech of lawyers representing clients in pending cases may be regulated under a less demanding standard than that established for regulation of the press" because lawyers "have special access to information through discovery and client communications," such that "their extrajudicial statements pose a threat to the fairness of a pending proceeding"). Thus, any such claim with respect to Count 13 fails.

43

or court order." By telling the two members of the HOA Board of Directors that she would dismiss her lawsuit against the HOA and the Board if they held a special election, Judge Peterson, who was acting as her own lawyer in the matter, communicated (and even attempted to negotiate) with parties to the lawsuit, even though she knew they were represented by counsel. As a result, she violated GRPC 4.2 (a). The "Terminology" section of the CJC defines "law" as "denot[ing] court rules as well as statutes, constitutional provisions, judicial emergency orders . . . and decisional law, including the Code of Judicial Conduct and Advisory Opinions of the Judicial Qualifications Commission." "The GRPCs are rules promulgated by this Court, which presumptively brings them within the scope of 'court rules,'" *Coomer II*, 316 Ga. at 862-863 (citation omitted), and Judge Peterson makes no argument that the GRPCs are not "court rules."[20]

Noting her testimony at the hearing that her comment about

---

[20] As we noted in *Coomer II*, "[b]ecause no such argument is before us today, we do not foreclose such an argument in a future case." 316 Ga. at 863 n.7.

dismissing the lawsuit was not meant to be a formal offer and that she did not actually believe that the two members of the Board of Directors had any actual authority to settle the lawsuit (because, as her lawsuit alleged, they were not properly elected), Judge Peterson asserts in her Exceptions that she did not violate GRPC 4.2 (a) because she was acting as a homeowner, not a lawyer, when she offered to dismiss the lawsuit. But the Hearing Panel rejected that version of Judge Peterson's testimony, expressly discrediting her "feigned ignorance" and instead finding that she was an "experienced" attorney who knew that the lawsuit she personally brought was still pending and that the defendants were represented by counsel. We defer to the Hearing Panel's credibility determination, see *Coomer I*, 315 Ga. at 847, and likewise conclude that Judge Peterson violated CJC Rule 1.1 for the reasons explained above.

(iii) *Judge Peterson's Conduct Outside Her Judicial Capacity Was Undertaken in Bad Faith and Is Prejudicial to the Administration of Justice, Such that Discipline is Authorized Under*

45

*Paragraph VII (a) of the Georgia Constitution*

As discussed more below, a judge may be disciplined for conduct undertaken "'in good faith'" in her judicial capacity, if that conduct "'appear[s] to be unjudicial and harmful to the public's esteem of the judiciary.'" *Coomer I*, 315 Ga. at 859 (citation omitted).[21] But "when a person who is a judge acts outside of that capacity, this Court's ability to discipline the judge is more limited. In order for actions taken outside of a judge's judicial capacity to constitute 'conduct prejudicial to the administration of justice' and thus within our constitutional power to discipline, those actions must be taken in bad faith." *Coomer II*, 316 Ga. at 861. Thus, as the Hearing Panel correctly noted in its Report and Recommendation,

---

[21] It appears that we first used the term "unjudicial" when defining "conduct prejudicial to the administration of justice which brings the judicial office into disrepute" in 1995, see *In the Matter of: Inquiry Concerning a Judge No. 94-70*, 265 Ga. at 328, and have since repeated that term in two other judicial discipline cases. See *Coomer I*, 315 Ga. at 859; *In the Matter of: Inquiry Concerning a Judge*, 265 Ga. at 844 n.2. At least some of us are concerned that the word "unjudicial" is conclusory and does little in the way of articulating a standard of conduct that a reasonable judge would understand. But even if that is so, it does not affect our analysis in this case, because the definition of the word "unjudicial" is not central to any substantive analysis pertaining to whether it is within our constitutional power to discipline Judge Peterson.

46

we may discipline Judge Peterson for her violation of CJC Rule 1.1 in connection with this incident only if her conduct was carried out in bad faith.

In this respect, the Hearing Panel found that Judge Peterson breached a known duty, because she testified that she was aware of GRPC 4.2 (a) and because the evidence showed that she was a prosecutor for several years (and then an elected judge) and was therefore familiar with the GRPC. The Hearing Panel also determined that Judge Peterson acted with self-interest and ill will, because she sought to exploit her specialized knowledge as a lawyer "in surprise settlement negotiations with laypersons on an unlevel playing field" to obtain the relief she wanted in her lawsuit. See *Coomer II*, 316 Ga. at 866 (explaining that the concept of bad faith "generally encompasses at least two general characteristics: that the duty breached by the actor was known to that actor, and that the actor was acting with some self-interest or ill will"). The Hearing Panel also noted that Judge Peterson's violation of Rule 1.1 was "clear" and that her "feigned ignorance" and "attempts to avoid

47

responsibility" for the violation in her testimony "bordered on the farcical, severely eroding her credibility with the Hearing Panel." This express finding of bad faith, which was based in significant part on the Panel's personal observation of Judge Peterson's testimony and the credibility determinations that flowed from it, is one to which we "offer considerable deference." *Coomer II*, 316 Ga. at 866. See also *Coomer I*, 315 Ga. at 862 (explaining that "this Court is not well positioned to resolve the factual questions of intent that are crucial to determining whether discipline is constitutionally permitted," and that the Hearing Panel, which has the opportunity to hear live testimony and observe the demeanor of witnesses, is best suited to make such findings). And because the Hearing Panel's finding of bad faith is supported by the evidence presented at the hearing, such that it is not clearly erroneous, we defer to that finding here. We likewise conclude that Judge Peterson's actions in communicating with represented parties about the lawsuit she had filed against them paint a picture of a judge who will bend the rules when it serves her self-interest, such that we can discern that her

actions were taken in bad faith and that discipline is authorized under Paragraph VII (a). See *Coomer II*, 316 Ga. at 872-873 (holding that the conduct underlying a judge's violations of CJC "Rule 1.1 and/or Rule 1.2 (A)," which was done outside the judge's judicial capacity, was prejudicial to the administration of justice and brought the judicial office into disrepute, because the record generally supported the Hearing Panel's findings that the judge undertook the conduct in bad faith).

(d) *Handling of a Petition for Year's Support (Counts 35 and 37 to 43)*

(i) *The Hearing Panel's Findings Are Not Clearly Erroneous as to Counts 35 and 37 to 43*

With respect to Count 35 and Counts 37 to 43, the Hearing Panel found the following facts pertaining to Judge Peterson's handling of a petition for year's support in the spring and summer of 2021. In early 2021, a petitioner filed the petition for year's support, seeking to obtain funds from her deceased husband's

49

estate.[22] The petition listed the petitioner's daughter as an interested party and provided her out-of-state address. Judge Peterson's chief clerk sent by certified mail, with restricted delivery, a notice of the petition to the address that was provided for the daughter; the notice set the deadline to submit a caveat to the petition by May 3, 2021. On April 5, 2021, the signature card for the certified delivery of the notice of the petition was returned to the probate court with a signature from someone else—not the daughter.[23] Judge Peterson's chief clerk then asked Judge Peterson

---

[22] See OCGA §§ 53-3-1 (providing, in pertinent part, that a decedent's surviving spouse is "entitled to year's support in the form of property for [her] support and maintenance for the period of 12 months from the date of the decedent's death" and that the provision of year's support generally is "to be preferred before all other debts or demands") & 53-3-5 (a) (providing, in pertinent part, that "[u]pon the death of any individual leaving an estate solvent or insolvent, the surviving spouse . . . may file a petition for year's support in the probate court having jurisdiction over the decedent's estate"). See also Mary F. Radford, 1 Georgia Wills & Administration § 10:1 (Nov. 2023 update) (explaining that "'year's support'" is "defined in the law as property that is set apart for the family's support and maintenance for the period of 12 months from the date the decedent died" and is "based on the public policy of providing support for the family of a decedent before allowing the estate to be distributed to creditors or other distributees").

[23] The record shows that the signature card was signed by someone with the same last name as the daughter, but with a different first name; no other evidence was presented about who signed the card.

to search LexisNexis to try to obtain an alternate address for the daughter. Judge Peterson conducted the search and found the daughter's e-mail address. Judge Peterson's chief clerk e-mailed a second notice to the daughter, setting a new deadline to file a caveat by July 10, 2021. The daughter eventually e-mailed her caveat to the probate court clerk's office.[24] The chief clerk and the daughter then spoke by phone, and the chief clerk asked about the status of the original document and the filing fee, which were both required for filing. The daughter said that she mailed the filing fee. The chief clerk assumed that it was lost in the mail and ultimately took payment from the daughter over the phone and filed the caveat on July 14, 2021—four days after the July 10 deadline. None of the chief clerk's communications with the daughter included counsel for the petitioner. The Hearing Panel found that although Judge Peterson's staff, including the chief clerk, knew that ex parte communications with parties to a proceeding were prohibited, Judge Peterson "clearly failed to conduct proper oversight" to ensure that the chief

---

[24] The exact date of this filing is not clear from the record.

clerk was not participating in such communications.

The petitioner's counsel filed a motion to strike the caveat as untimely, and Judge Peterson denied it. Judge Peterson later recused herself from the case, which was eventually transferred to Douglas County Superior Court; that court struck the caveat as untimely and granted the petition for year's support about 15 months after it was first filed.

The record supports the findings summarized above, so we conclude that they are not clearly erroneous. See *Coomer II*, 316 Ga. at 860-861.

(ii) *Judge Peterson Violated CJC Rules 1.1, 1.2 (A), 2.9 (A), 2.9 (B), and 2.9 (D)*

We agree with the Hearing Panel that the Director proved by clear and convincing evidence that Judge Peterson violated CJC Rules 1.1 (Count 35), 1.2 (A) (Count 37), 2.9 (A) (Count 39), 2.9 (B) (Count 40), and 2.9 (D) (Count 42) in connection with her handling

of the petition for year's support.[25]

---

[25] CJC Rule 2.9 (A) says,

Judges shall accord to every person who has a legal interest in a proceeding, or that person's lawyer, the right to be heard according to law. Judges shall not initiate, permit, or consider ex parte communications, or consider other communications made to them outside the presence of the parties, or their lawyers, concerning a pending proceeding or impending matter, subject to the following exceptions.

(1) Where circumstances require, ex parte communications are authorized for scheduling, administrative purposes, or emergencies that do not deal with substantive matters or issues on the merits, provided that:

(a) the judge reasonably believes that no party will gain a procedural, substantive, or tactical advantage as a result of the ex parte communication; and

(b) the judge makes provision promptly to notify all other parties of the substance of the ex parte communication, and gives the parties an opportunity to respond.

(2) Judges may obtain the advice of a disinterested expert on the law applicable to a proceeding before the court, if they give notice to the parties of the person consulted and the substance of the advice, and afford the parties reasonable opportunity to respond.

(3) Judges may consult with court staff and court officials whose functions are to aid in carrying out adjudicative responsibilities, or with other judges, provided the judge makes reasonable efforts to avoid receiving factual information that is not part of the record, and does not abrogate the responsibility personally to decide the matter.

(4) Judges may, with the consent of the parties, confer separately with the parties or their lawyers in an effort to mediate or settle pending proceedings.

(5) Judges may initiate, permit, or consider ex parte communications when authorized by law to do so, such as when issuing temporary protective orders, arrest warrants, or search warrants, or when serving on therapeutic, problem-solving, or

We turn first to the alleged CJC Rule 2.9 violations. By accepting and considering the daughter's e-mailed caveat, of which the petitioner and her counsel had no notice, Judge Peterson "permit[ted]" and "consider[ed] ex parte communications" in violation of CJC Rule 2.9 (A). And as the Hearing Panel noted in its Report and Recommendation, none of the exceptions listed in CJC Rule 2.9 (A) that might authorize ex parte communications applied here. Compare *Lue v. Eady*, 297 Ga. 321, 323 (773 SE2d 679) (2015) (explaining, in the context of examining the denial of a motion to recuse, that former Canon 3 of the prior CJC, which contained language similar to Rule 2.9 (A) (1), authorized ex parte

accountability courts, including drugs courts, mental health courts, and veterans' courts.

CJC Rule 2.9 (B) says, "If a judge inadvertently receives an unauthorized ex parte communication bearing upon the substance of a matter, the judge shall make provision promptly to notify the parties of the substance of the communication and provide the parties with a reasonable opportunity to respond." CJC Rule 2.9 (D) says, "A judge shall make reasonable efforts, including providing appropriate supervision, to ensure that this Rule is not violated by court staff, court officials, and others subject to the judge's direction and control."

As discussed further below in Division 2 (e), we do not decide whether the conduct alleged in Counts 38, 41, and 43 constituted violations of the CJC.

54

communications with respect to scheduling hearings). By failing "promptly to notify" the petitioner's counsel of the second notice of the petition that was sent to the daughter by e-mail (with the extended deadline for filing a caveat), Judge Peterson violated CJC Rule 2.9 (B). And by failing to provide proper oversight to her own chief clerk—who sent the daughter the second notice of the petition and spoke to the daughter on the phone about the case, without notifying the petitioner's counsel of these communications—Judge Peterson violated CJC Rule 2.9 (D) because she failed to "make reasonable efforts, including providing appropriate supervision, to ensure that [Rule 2.9] is not violated by court staff, court officials, and others subject to the judge's direction and control." Accordingly, Judge Peterson violated each of the provisions of CJC Rule 2.9 noted above. See CJC Rule 2.9 Comment [11] ("Impending matters and pending proceedings are only as good as the parties make them; neutral and detached impartial judges should not be concerned about augmenting cases."); *Inquiry Concerning Anderson*, 304 Ga. 165, 166 (816 SE2d 676) (2018) (holding that a judge violated CJC

Rule 2.9 (A) when he communicated with parties to a lawsuit individually, even if such communications were made "with good intentions"). Cf. *State v. Hargis*, 294 Ga. 818, 823 n.11 (756 SE2d 529) (2014) (explaining that "trial judges 'must scrupulously avoid [improper] ex parte communications'") (citation omitted).[26]

As to the other alleged rule violations pertaining to these counts, the Hearing Panel concluded that Judge Peterson violated CJC Rule 1.1 by failing to comply with Uniform Probate Court Rule 5.1, which generally prohibits judges from initiating or considering ex parte communications with parties to a pending proceeding. The Hearing Panel determined that Judge Peterson also violated CJC Rule 1.2 (A), because permitting and sending communications to only one of the interested parties in the case diminishes "public confidence in the independence, integrity, and impartiality of the judiciary" and weakens the public's perception that the judge has

---

[26] Judge Peterson argues in her Exceptions that the ex parte communications were permissible because they were made in an effort to perfect service. But her attempts to ensure that the daughter had notice of the proceedings, even if undertaken in good faith, do not excuse her failure to provide the same sort of notice to the petitioner.

afforded all of the parties the same right to be heard. We agree with the Hearing Panel's determinations in this regard.[27]

(iii) *Judge Peterson's Conduct Is Prejudicial to the Administration of Justice, Such that Discipline is Authorized Under Paragraph VII (a) of the Georgia Constitution*

We agree with the Hearing Panel that Judge Peterson's "'inappropriate [judicial] actions taken in good faith'" with respect to her handling of the petition are prejudicial to the administration of justice and bring the judicial office into disrepute. See Ga. Const., Art. VI, Sec. VII, Par. VII (a). "'Conduct prejudicial to the administration of justice' refers to inappropriate actions taken in good faith by the judge acting in her judicial capacity, but which may

---

[27] We note, however, that in determining the appropriate sanction in this case, we afford little weight to the Hearing Panel's conclusion that Judge Peterson's permitting and sending ex parte communications violated CJC Rule 1.2 (A), which covers a broad and wide-ranging category of conduct— "promot[ing] public confidence in the independence, integrity, and impartiality of the judiciary." Generally speaking, when a specific rule governs a type of conduct, that specific rule should be the focus of a disciplinary action, rather than the CJC's less specific, vaguer rules. Cf. *Smallwood v. State*, 310 Ga. 445, 452 (851 SE2d 595) (2020) (explaining, in the context of rejecting an appellant's argument that he should have received a lesser criminal sentence under the rule of lenity, that "a specific statute will prevail over a general statute, absent any indication of a contrary legislative intent").

appear to be unjudicial and harmful to the public's esteem of the judiciary." *Coomer I*, 315 Ga. at 859 (citation and punctuation omitted).[28] Judge Peterson was acting in her judicial capacity in handling the petition and in directing or supervising her staff. As the Hearing Panel noted, even if Judge Peterson did not intend to favor one party over another, engaging in ex parte communications is inappropriate and "unjudicial." We agree; engaging in or allowing ex parte communications presents to the public an image of a judge who covertly interacts with a party in order to unfairly advance that party's interests and jeopardizes the appearance of the independence, integrity, and impartiality of the judiciary. Because Judge Peterson's inappropriate actions taken in her judicial capacity, even if undertaken in good faith, appeared to be "'unjudicial and harmful to the public's esteem of the judiciary,'" *Coomer I*, 315 Ga. at 859 (citation omitted), her conduct is

---

[28] As explained above in connection with the charges related to the HOA meeting, "'[p]rejudicial conduct may also refer to actions taken in bad faith by a judge acting outside her judicial capacity.'" *Coomer I*, 315 Ga. at 859 (citation omitted).

prejudicial to the administration of justice and discipline regarding these counts is authorized under the Georgia Constitution. See Ga. Const., Art. VI, Sec. VII, Par. VII (a).

(e) *Other Alleged Violations Found by the Hearing Panel, Which We Decline to Consider*

In addition to the violations of the CJC that we determined above that Judge Peterson committed and for which she may be disciplined pursuant to Paragraph VII (a) of the Georgia Constitution, the Hearing Panel concluded that the Director proved by clear and convincing evidence eight other counts in the formal charges (Counts 14-15, 19, 21, 38, 41, 43, and 50). We briefly discuss below the Hearing Panel's findings, which we determine are not clearly erroneous, as to these counts. But ultimately, we need not decide whether the Panel correctly determined that the conduct underlying those counts constituted violations of the CJC or sanctionable conduct under Paragraph VII (a), because the affirmance of those counts is not necessary to reach the conclusion that Judge Peterson's removal from the bench is the appropriate

59

sanction in this case.[29]

As to Judge Peterson's conduct at the HOA meeting, the Hearing Panel concluded that Judge Peterson violated CJC Rules 1.2 (A) (Count 14) and 1.2 (B) (Count 15) when she "repeatedly cut off homeowners as they attempted to speak; engaged in petty quibbles with them; mocked them; and used cavalier, rude gestures

---

[29] We also note that with respect to Judge Peterson's conduct toward county personnel as alleged in Counts 28 and 30 (discussed above), the Hearing Panel made additional findings that formed alternate bases for the violations of CJC Rules 1.2 (B) and 2.8 (B). Specifically, the Panel found that Judge Peterson sent an e-mail to the Chief Judge of the Douglas County Superior Court in which she questioned the Chief Judge's authority and competency and said to the Chief Judge, among other things, "Please retire as this county has outgrown your spirit." The Hearing Panel also determined that after Judge Peterson had several e-mail exchanges with an employee in the Douglas County Information Services Department about transferring probate court case files to a new case management system, Judge Peterson sent an e-mail to the employee and other county officials threatening to "move forward with legal action" if the data transfer was not facilitated. Although Judge Peterson argues in her Exceptions to the Report and Recommendation that the Hearing Panel's findings in these respects are clearly erroneous, she does not argue that the Panel's findings of misconduct do not constitute violations of CJC Rules 1.2 (B) and 2.8 (B). Although the Panel's factual findings are not clearly erroneous, we question whether those findings support the conclusions that Judge Peterson violated Rules 1.2 (B) and 2.8 (B). But because we determined above that the Director proved Counts 28 and 30 by showing that Judge Peterson's requesting sheriff's deputies and activating the panic button violated CJC Rules 1.2 (B) and 2.8 (B), we need not address whether the Hearing Panel correctly concluded that Judge Peterson violated those same rules in the other ways that those counts alleged.

while communicating," because those interactions fell short of the high standards of conduct necessary to maintain the integrity of the judiciary. And as to Judge Peterson's handling of the petition for year's support, the Hearing Panel found that Judge Peterson violated CJC Rule 2.9 (C) (Count 41), which prohibits judges from "investigat[ing] facts in a pending proceeding," by researching alternative addresses for the daughter. The Panel also found that Judge Peterson violated CJC Rule 2.5 (A) (Counts 38 and 43), which says that "[j]udges shall perform judicial and administrative duties competently, diligently, and without bias or prejudice," because her extension of the deadline to file a caveat and acceptance of the untimely caveat created "an appearance of bias in favor" of the daughter; her actions led to a 15-month delay in resolving the petition, which was "anything but diligent"; and she incorrectly transferred the case to the superior court and then failed to ensure that the entire record was transmitted.

In addition, the Hearing Panel made findings as to a separate incident, involving Judge Peterson's conduct in allowing a party to

a wedding over which she was scheduled to preside to enter the Douglas County Courthouse, while the courthouse was closed, without ensuring that the party underwent security screening by sheriff's deputies, in contravention of an express directive from the Division Commander for Court Services with the Douglas County Sheriff's Office not to allow the party inside (Counts 19 and 21). The Hearing Panel ultimately concluded that Judge Peterson violated CJC Rules 1.2 (B) (Count 19) and 2.5 (B) (Count 21), which says in pertinent part that "[j]udges . . . shall cooperate with . . . court officials in the administration of court business," because she violated the courthouse security protocol and the division commander's directive by allowing civilians to enter the courthouse without required security screenings.

And finally, the Hearing Panel concluded that Judge Peterson violated CJC Rule 2.4 (A), as alleged in Count 50 of the formal charges, "by persistently and continuously failing to respect and comply with the law and the [CJC] as alleged in Counts Sixteen through Forty-Nine above, demonstrating systemic judicial

incompetence and a disregard for the law." CJC Rule 2.4 (A) says, "Judges shall be faithful to the law and maintain professional competence in it. Judges shall not be swayed by partisan interests, public clamor or intimidation, or fear of criticism." The Hearing Panel found in its Report and Recommendation that the Director had proven this count by clear and convincing evidence "based on all the findings of fact and conclusions of law above, as well as the pervasive nature and expansive temporal scope of [Judge Peterson's] misconduct."

The Hearing Panel's factual findings with respect to Counts 14-15, 19, 21, 38, 41, 43, and 50 generally are supported by the evidence presented at the hearing, but we need not decide whether the Hearing Panel correctly concluded that Judge Peterson's conduct violated Rules 1.2 (A) and (B), 2.5 (A) and (B), 2.9 (C), and 2.4 (A), as alleged in those counts, or whether discipline is authorized under Paragraph VII (a) for any or all of the conduct at issue, because the affirmance of those counts is not necessary to reach our conclusion that Judge Peterson's removal from the bench is the appropriate

sanction in this case.[30]

### 3. *Removal Is The Appropriate Sanction*

We have determined above that Judge Peterson violated eight provisions of the CJC, as charged in 12 counts: CJC Rule 1.1 (Count 13) in connection with her communications with represented parties at the HOA meeting; Rules 1.2 (B) (Count 28) and 2.8 (B) (Count 30) in connection with her conduct toward county personnel; Rules 1.1 (Count 31), 1.2 (A) (Count 32), 1.2 (B) (Count 33), and 2.2 (Count 34) in connection with the criminal contempt matter; and Rules 1.1

---

[30] We note, however, that with respect to certain types of charges, some of us have concerns about how to determine whether and what conduct would rise to the level of a CJC violation such that discipline would be authorized under the Georgia Constitution. To that end: the more generalized the category of conduct, the more difficult it can be to discern whether the CJC provides sufficient notice to judges about what conduct may violate the provision. See, e.g., CJC Rules 1.2 (A) (requiring judges to "act at all times in a manner that promotes public confidence in the independence, integrity, and impartiality of the judiciary"); 2.5 (B) (requiring judges to "cooperate with other judges and court officials in the administration of court business"); 2.8 (B) (requiring judges to be "patient, dignified, and courteous to litigants, jurors, witnesses, lawyers, and others with whom they deal in their official capacity"). We also note that Judge Peterson has not challenged the original public meaning of the constitutional term "habitual intemperance," and that the Hearing Panel did not endeavor to construe that phrase before determining that certain of Judge Peterson's conduct demonstrated habitual intemperance that would authorize discipline. But we need not resolve any of these questions today to complete our analysis of the claims before us in Judge Peterson's case.

(Count 35), 1.2 (A) (Count 37), 2.9 (A) (Count 39), 2.9 (B) (Count 40), and 2.9 (D) (Count 42) in connection with her handling of the petition for year's support.[31] We have also determined that discipline for Judge Peterson's violations of these rules is constitutionally permitted, because her actions constituted willful misconduct in office or conduct prejudicial to the administration of justice which brings the judicial office into disrepute. See Ga. Const., Art. VI, Sec. VII, Par. VII (a).

The Hearing Panel noted in its Report and Recommendation that the violations at issue here, when viewed individually, likely would not warrant the sanction of removal from office. We agree. See *In the Matter of: Inquiry Concerning a Judge*, 275 Ga. at 406-412 (determining that removal from office was the proper sanction and noting that "[c]onsidered in isolation, none of [the judge's] actions

---

[31] As we noted above, we pretermitted whether Judge Peterson violated six provisions of the CJC, as charged in eight additional counts: CJC Rules 1.2 (A) (Count 14) and 1.2 (B) (Count 15) in connection with her conduct at the HOA meeting; Rules 1.2 (B) (Count 19) and 2.5 (B) (Count 21) in connection with admitting the wedding party to the courthouse; Rules 2.9 (C) (Count 41) and 2.5 (A) (Counts 38 and 43) in connection with her handling of the petition for year's support, and 2.4 (A) (Count 50) related to the allegation of systemic incompetence.

would warrant his removal from the bench" but that "[c]onsidered as a whole, . . . [the judge's] actions demonstrate[d] a troubling pattern of ineptitude and misconduct"). But the Hearing Panel also determined that Judge Peterson's misconduct related to the contempt matter was "troubl[ing]" and "discordant with one of the judiciary's primary purposes: to provide due process to all who come into court, especially when one's freedom is at stake," and that her pattern of misconduct related to the many other matters exhibits a "persistent unwillingness to apply to herself the rules that apply to everyone else." In particular, the Hearing Panel's findings (which we have determined were not clearly erroneous) show that Judge Peterson acted in bad faith in her judicial capacity by willfully disregarding the petitioner's basic due-process rights in the criminal contempt proceeding, which portrays to the public an image of a judge who believes she is above the law. And the Hearing Panel's findings that Judge Peterson acted in bad faith *outside* her judicial capacity by knowingly communicating with represented parties at the HOA meeting present a comparable image. See *Coomer II*, 316

Ga. at 865-866 ("[J]udges are not above the law and must respect the law, because otherwise they cannot be trusted to apply the law honestly and fairly."); *Fowler*, 287 Ga. at 472 ("[W]e cannot expect that members of the public will respect the law and remain confident in our judiciary while judges who do not respect and follow the law themselves remain on the bench."); *In the Matter of: Inquiry Concerning a Judge*, 265 Ga. at 852 (explaining that judges "are entrusted with the duty to safeguard the fundamental rights of others" and holding that when "it is established by clear and convincing evidence that an individual is not competent to sit as a judge because she has breached that sacred trust, the same great authority that established those fundamental rights commands us to protect the citizenry and the judicial system from harm, and remove that individual"). The Hearing Panel's findings similarly establish that Judge Peterson acted in bad faith in her judicial capacity toward county officials when she requested sheriff's deputies to be present after regular courthouse hours—including overnight—and when she activated the panic button in her judicial

chambers. See id. at 852 (explaining that "[t]hose who are called upon to live the life of a judge must act with dignity and respect toward others"). And although Judge Peterson possibly acted in good faith by permitting the ex parte communications with respect to the petition for year's support, her misconduct demonstrated a failure to comprehend and follow the law, which in turn causes prejudice to the administration of justice. As the Hearing Panel determined in recommending her removal, Judge Peterson's "misconduct has already demonstrably eroded the public's respect for the judicial system." And regardless of the extent to which the Hearing Panel considered the mitigating evidence that Judge Peterson offered at the hearing and emphasizes again before this Court, we conclude that such evidence is not particularly persuasive, as the instances of misconduct at issue here spanned nearly the entirety of Judge Peterson's judicial career.

Moreover, the Hearing Panel's determinations supported a conclusion that Judge Peterson was "disingenuous, if not outright dishonest," during the JQC proceedings, because she provided

68

untruthful or evasive testimony with respect to, among other things, her conduct regarding the HOA meeting and the courthouse wedding. The Hearing Panel noted in this respect that Judge Peterson "falsely testified" that she made no recording of the events that took place at the HOA meeting, pointing out that the video recording of the meeting that was admitted into evidence at the hearing showed that she held up her cell phone, indicating that she had in fact recorded the meeting. It also noted that Judge Peterson's "attempts to avoid responsibility" for violations related to the HOA meeting "severely erod[ed] her credibility with the Hearing Panel."

The Hearing Panel also found that Judge Peterson falsely testified that after the division commander told her not to take the wedding party into the courthouse, the sheriff overrode that directive and "granted her permission to enter the courthouse" to perform the wedding ceremony, because the Hearing Panel "fully credit[ed]" the sheriff's testimony, which "flatly contradicted" those assertions. In addition, the Hearing Panel expressly concluded in other sections of its Report and Recommendation that Judge

69

Peterson lied during her testimony, including when she claimed that she had not predetermined that the petitioner was guilty of criminal contempt before she issued the notice of hearing on the petition, when she stated that she was not aware of the purpose of the panic button, and when she "feigned ignorance" about communicating with represented parties at the HOA meeting. As we recently explained in determining that another judge's "disingenuous, if not outright dishonest" testimony during the JQC proceedings informed our decision to remove him,

> a judge faced with an ethics investigation by the JQC has every right to defend himself. He can argue that his actions do not violate a particular statute or rule, including the Code of Judicial Conduct. He can disagree with JQC staff or the Hearing Panel as to appropriate sanctions. He can dispute the factual accuracy of the allegations against him. And judges must be free to do all of those things without fear that a sanction will be worse if they simply fail to prevail. But judges cannot be misleading during that process, any more than lawyers can be misleading during State Bar disciplinary processes.

*Coomer II*, 316 Ga. at 874. As in *Coomer II*, the Hearing Panel in this case found multiple instances in which Judge Peterson attempted to mislead the Panel by falsely testifying, indicating her

70

desire to conceal her misconduct. Because those findings are supported by the evidence at the hearing, we consider them as an aggravating favor in determining the proper sanction. See id. at 874-875 & n.19.[32]

In conclusion, in light of her multiple violations of the CJC rules in relation to several matters—some of them reflecting a flagrant disregard for the law, court rules, and judicial conduct rules; the pattern of violations that the Director proved by clear and convincing evidence; the extremely concerning nature of some of those violations, in particular with respect to the criminal contempt matter; and her behavior during the JQC inquiry, we conclude that removal is the appropriate sanction. See, e.g., *Fowler*, 287 Ga. at 472 (holding that removal from office was the appropriate sanction

---

[32] As we recognized in *Coomer II*, "imposing discipline on a judge solely based on the judge's response to a JQC inquiry"—in other words, conduct during a JQC hearing—"without the JQC first filing formal charges against the judge alleging such conduct constituted a violation of the Code of Judicial Conduct, might raise due process concerns." 316 Ga. at 874 n.19. But this case, like *Coomer II*, does not present that scenario, because we have already concluded that Judge Peterson violated several provisions of the CJC through her actions that took place before the JQC inquiry and we consider her actions during the JQC process as an aggravating factor only in determining the proper sanction. See id.

71

where the judge exhibited a "consistent pattern of misconduct" that stemmed from "willful misconduct in office . . . and conduct prejudicial to the administration of justice which brings the judicial office into disrepute," among other things) (cleaned up); *In the Matter of: Inquiry Concerning a Judge*, 275 Ga. at 406-412 (determining that removal from office was the proper sanction for a judge who, among other things, demonstrated a lack of competence in the law, failed to safeguard basic constitutional rights of litigants, and failed to respect and comply with the law with respect to multiple matters of misconduct, and noting that "[c]onsidered in isolation, none of [the judge's] actions would warrant his removal from the bench" but that "[c]onsidered as a whole, . . . [the judge's] actions demonstrate[d] a troubling pattern of ineptitude and misconduct"); *In the Matter of: Inquiry Concerning a Judge*, 265 Ga. at 850-852 (concluding that removal from office was the appropriate discipline for a judge who violated multiple former canons of the prior CJC, including in five instances disregarding defendants' "basic and fundamental constitutional rights," which "exhibit[ed] an

72

intolerable degree of judicial incompetence, and a failure to comprehend and safeguard the very basis of our constitutional structure").

Accordingly, it is ordered that Judge Christina Peterson of the Douglas County Probate Court be removed from office, effective upon the date of this opinion. As a result, Judge Peterson "shall not be eligible to be elected or appointed to any judicial office in this state until seven years have elapsed" from the date of this opinion. OCGA § 15-1-13 (a).

*Removed from office. All the Justices concur, except Colvin, J., disqualified.*

PETERSON, Presiding Justice, concurring.

I concur fully in the Court's opinion today removing Judge Christina Peterson from office. I write separately in response to Commissioner Hyde's thoughtful concurrence (joined by Commissioners McBurney and Lopez) to the JQC Hearing Panel's Report and Recommendation. In his concurrence, Commissioner

73

Hyde writes that for some of the counts of lesser misconduct proven by the JQC Director, he would have liked to have suggested a suspension without pay, but he does not believe that to be a type of judicial discipline authorized by the Georgia Constitution. I appreciate this careful respect the Hearing Panel members show for the constitutional limits on the authority of the JQC and this Court. And I agree that the question is open to reasonable debate. But as I explain below, I think that the best interpretation of relevant provisions of the Georgia Constitution is that the constitutional authority to discipline judges *does* include the authority to suspend a judge without pay.

Article VI, Section VII, Paragraph VII ("Paragraph VII") of the Georgia Constitution explicitly provides three possible forms of discipline of judges for various forms of misconduct — removal, suspension, or other unspecified discipline. See Ga. Const. of 1983, Art. VI, Sec. VII, Par. VII (a). An earlier paragraph in that same section of Article VI, Section VII, Paragraph V ("Paragraph V"), provides in part that "[a]n incumbent's salary, allowance, or

74

supplement shall not be decreased during the incumbent's term of office." Commissioner Hyde's concurrence understands this provision to prohibit suspension without pay. That's a reasonable reading. But based on the text, history, and context of these provisions, I conclude that the Georgia Constitution permits a judge to be suspended without pay once the judge has been afforded due process.[33] See *Elliott v. State*, 305 Ga. 179, 188 (II) (C) (824 SE2d 265) (2019) ("[A]ny decision about the scope of a provision of the Georgia Constitution must be rooted in the language, history, and context of that provision." (citation and punctuation omitted)).

Examining the text of the relevant provisions, there is nothing about the term "suspension" that itself suggests continuing receipt of pay. As Commissioner Hyde notes, a suspension with pay

---

[33] This kind of suspension-as-discipline is imposed only by consent or at the end of the full JQC disciplinary process and after a determination by this Court that the judge violated the Code of Judicial Conduct and that discipline is appropriate. That is different from the interim suspension that JQC Rule 15 permits upon indictment, see JQC Rule 15 (A) (suspension with pay), conviction, see JQC Rule 15 (B) (suspension without pay), or a determination that a judge poses a substantial threat of serious harm to the public or to the administration of justice, see JQC Rule 15 (C) (suspension with pay or transfer to inactive status with pay).

amounts to little discipline at all, such that this key term in Paragraph VII would be robbed of significant meaning if that were all that "suspension" meant. This is especially so when imposed after providing due process and concluding that a violation of the Code of Judicial Conduct in fact has been committed and the conduct is of such character as to invoke this Court's authority to discipline under Paragraph VII. And the language of Paragraph V on its face — forbidding decrease in an incumbent's "salary" during a term of office — does not require us to impose this meaning on the term "suspension" in Paragraph VII. "Salary" generally was defined around the time of the ratification of the 1983 Georgia Constitution as a fixed rate of pay for services *when they are rendered.* See Webster's New World Dictionary of the American Language (2d college ed. 1980) 1255 (defining "salary" as "a fixed payment at regular intervals *for services*, esp. when clerical or professional" (emphasis supplied)). Not paying a person while that person is legally prohibited from rendering services for some period of time does not decrease that person's "salary" within the ordinary

76

meaning of that word.

This understanding of the meaning of the term "suspension" is consistent with the context in which the people ratified the constitution containing the current version of Paragraph VII. Paragraph VII (a) was ratified in its current form in 1983. See *Inquiry Concerning Judge Coomer*, 315 Ga. 841, 858-859 (6) nn.11-12 (885 SE2d 738) (2023). Paragraph V also entered the Georgia Constitution with the 1983 overhaul. See Ga. L. 1981 (Extraordinary Session), pp. 143, 182; Ga. L. 1983, p. 2070. The 1976 Constitution contained neither the provision for suspension as a form of judicial discipline nor the language forbidding a decrease in a judge's salary. See Ga. Const. 1976, Art. VI, Sec. XII; Art. VI, Sec. XIII. In determining the meaning of a constitutional provision as understood by the people when they ratified it, "it is the understanding of the text by reasonable people familiar with its legal context that is important[.]" *Elliott*, 305 Ga. at 207 (III) (C) (ii) (citation and punctuation omitted). Just a few years before the ratification of the current version of Paragraph VII, we suspended a

77

judge without pay as a means of judicial discipline. See *In re Judge Broome*, 245 Ga. 227, 229 (264 SE2d 656) (1980). Although I have found one instance prior to the voters' approval of the 1983 Constitution[34] where this Court imposed a suspension as a form of judicial discipline without specifying whether the suspension was with or without pay, see *In the Matter of: Inquiry Concerning a Judge No. 469*, 249 Ga. 425, 427 (292 SE2d 59) (1982), I have not found any reported case prior to the ratification of the 1983 Constitution in which this Court made clear that it was suspending a judge with pay.[35] This supports a conclusion that when the people approved the current form of Paragraph VII, they understood the term "suspension" as contained therein to mean suspension without pay.

This conclusion about the meaning of the term "suspension"

---

[34] The people voted to approve the new Constitution on November 2, 1982. See *Bldg. Auth. of Fulton County v. State of Ga.*, 253 Ga. 242, 245 (3) (321 SE2d 97) (1984).

[35] In 1978, in lieu of removal, we ordered that a Senior Judge of the superior courts be "prohibited and restricted from presiding as judge of the superior courts in any judicial proceeding whatsoever at any time after this date." *In re Judge Dunahoo*, 240 Ga. 617, 618 (242 SE2d 116) (1978).

also is consistent with our handling of judicial discipline matters under the 1983 Constitution. We have suspended judges without pay numerous times in the years since the ratification of that Constitution.[36] See *Inquiry Concerning Judge Gundy*, 314 Ga. 430, 434 (877 SE2d 612) (2022); *Inquiry Concerning Judge Hays*, 313 Ga. 148, 150 (868 SE2d 792) (2022); *In the Matter of: Inquiry Concerning a Judge* No. *93-154*, 263 Ga. 883, 884 (440 SE2d 169) (1994); *In the Matter of: Inquiry Concerning a Judge Nos. 1546, 1564, 1666*, 262 Ga. 252, 253 (417 SE2d 129) (1992); *In the Matter of: Inquiry Concerning a Judge No. 1228*, 259 Ga. 146, 147 (378 SE2d 115) (1989); *In the Matter of: Inquiry Concerning a Judge No. 1036*, 257 Ga. 481, 481 (361 SE2d 158) (1987); *In the Matter of: Inquiry Concerning a Judge No. 1035*, 257 Ga. 479, 480 (361 SE2d 157) (1987); *In the Matter of: Inquiry Concerning a Judge No. 693*, 253 Ga. 485, 486 (321 SE2d 743) (1984); *In the Matter of: Inquiry*

---

[36] Of course, the fact that we have done so does not mean that we were right to do so. At least Gundy and Hays were suspended by consent. But while a judge may consent to waive procedural rights, a judge cannot by agreement confer on this Court power that it does not already possess.

*Concerning a Judge No. 481*, 251 Ga. 524, 525 (307 SE2d 505) (1983); *In the Matter of: Inquiry Concerning a Judge No. 506*, 250 Ga. 764 (300 SE2d 808) (1983). Although we did not do so with any fulsome analysis of whether such a sanction was consistent with Paragraph V, that may simply reflect a consistent understanding that a suspension without pay is constitutionally permissible.[37]

Another provision in Paragraph VII, addressing discipline for judges who are the subject of criminal proceedings, bolsters this conclusion. See Ga. Const., Art VI, Sec. VII, Par. VII (b) (1). This provision requires in certain cases the suspension of a judge who is indicted for a felony in state or federal court pending final disposition of the case or expiration of the judge's term of office. See id. This provision explicitly provides for that suspension to be with

---

[37] Indeed, we have treated "suspension" as a serious sanction, bolstering the idea that we understand suspension to be unpaid, something very different from a paid vacation. See *Inquiry Concerning Judge Crawford*, 310 Ga. 403, 408 (851 SE2d 572) (2020) (Blackwell, J., concurring) (describing censure, public reprimand, and limitations on the performance of judicial duties as "*lesser* sanctions" than the removal and suspension sanctions expressly authorized by the Constitution and concluding that they "fit comfortably within the constitutional authorization for judges to be 'otherwise disciplined' for judicial misconduct" (emphasis in original)), concurrence cited favorably in *Kinslow v. State*, 311 Ga. 768, 774 (860 SE2d 444) (2021).

pay under some circumstances, and without pay in others, depending on the amount of process offered: "While a judge is suspended under this subparagraph and until initial conviction by the trial court, the judge shall continue to receive the compensation from his office. After initial conviction by the trial court, the judge shall not be entitled to receive the compensation from his office." Id. This suspension without pay is not equivalent to removal, as the subparagraph provides that if the judge's conviction is overturned as a result of a direct appeal or application for a writ of certiorari, the judge shall be reinstated immediately, at which point the judge will be entitled to any withheld compensation. See id.

Of course, the Georgia Constitution provides that "[n]o action shall be taken against a judge except after hearing and in accordance with due process of law." Ga. Const., Art. VI, Sec. VII, Par. VIII. "Based on this provision, this Court has said the JQC's authority to enforce the Code is not unlimited, inasmuch as the Constitution requires the Commission to afford due process to judges and provides for this Court to review the imposition of

81

discipline." *Inquiry Concerning Judge Coomer*, 315 Ga. at 849 (4) (a) (citation and punctuation omitted). "Federal due process requirements also apply" to the discipline of Georgia judges. Id. at 849 (4) (a) n.3. Therefore, this Court cannot suspend judges without pay on an interim basis, before disciplinary proceedings have afforded full due process. See id. at 844 (2) (noting that interim suspension of judge was with pay per Paragraph V). But, although this case does not require us to decide the question, my best reading is that Paragraph V does not forbid the use of a suspension without pay as a sanction for judicial misconduct once due process has been provided.

I am authorized to state that Chief Justice Boggs joins in this concurrence.

Decided June 25, 2024.

Judicial discipline.

*Courtney M. Veal, Anna G. Cross*, for Judicial Qualifications Commission.

*Akin & Tate, S. Lester Tate III; Elizabeth S. White*, for Peterson.